B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Bavaria Yachts USA, LLLP | DEFENDANTS<br>Bavaria Yachtbau GmbH |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Louis G. McBryan<br>McBryan, LLC<br>1380 W. Paces Ferry Road, Suite 1150<br>Atlanta, Georgia 30327<br>(678) 733-9322 | ATTORNEYS (If Known)<br>Richard L. Robbins<br>Robbins Ross Alloy Belinfante Littlefield LLC<br>999 Peachtree Street, NE, Suite 1120<br>Atlanta, Georgia 30309<br>(678) 701-9381 |
| PARTY (Check One Box Only)<br>■ Debtor         □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor      □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>□ Debtor         □ U.S. Trustee/Bankruptcy Admin<br>■ Creditor      □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Preferential Transfers §547, Fraudulent Conveyances §548, Claim Objection §502, Declaratory Action, Equitable Subordination §510, Breach of Warranty, Unjust Enrichment, Tortious Interference

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| FRBP 7001(1) – Recovery of Money/Property | FRBP 7001(6) – Dischargeability (continued) |
|---|---|
| □ 11-Recovery of money/property - §542 turnover of property | □ 61-Dischargeability - §523(a)(5), domestic support |
| ☒ 12-Recovery of money/property - §547 preference | □ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| □ 13-Recovery of money/property - §548 fraudulent transfer | □ 63-Dischargeability - §523(a)(8), student loan |
| □ 14-Recovery of money/property - other | □ 64-Dischargeability - §523(a)(15), divorce or separation obligation |
| | (other than domestic support) |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** | □ 65-Dischargeability - other |
| ☒ 21-Validity, priority or extent of lien or other interest in property | |
| | **FRBP 7001(7) – Injunctive Relief** |
| **FRBP 7001(3) – Approval of Sale of Property** | □ 71-Injunctive relief – imposition of stay |
| □ 31-Approval of sale of property of estate and of a co-owner - §363(h) | □ 72-Injunctive relief – other |
| | |
| **FRBP 7001(4) – Objection/Revocation of Discharge** | **FRBP 7001(8) Subordination of Claim or Interest** |
| □ 41-Objection / revocation of discharge - §727(c),(d),(e) | ☒ 81-Subordination of claim or interest |
| | |
| **FRBP 7001(5) – Revocation of Confirmation** | **FRBP 7001(9) Declaratory Judgment** |
| □ 51-Revocation of confirmation | ☒ 91-Declaratory judgment |
| | |
| **FRBP 7001(6) – Dischargeability** | **FRBP 7001(10) Determination of Removed Action** |
| □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims | □ 01-Determination of removed claim or cause |
| □ 62-Dischargeability - §523(a)(2), false pretenses, false representation, | **Other** |
| actual fraud | □ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq. |
| □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | ☒ 02-Other (e.g. other actions that would have been brought in state court |
| **(continued next column)** | if unrelated to bankruptcy case) |

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Bavaria Yachts USA, LLLP | BANKRUPTCY CASE NO.<br>15-68583-jrs | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Georgia | DIVISION OFFICE<br>Atlanta | NAME OF JUDGE<br>Sacca |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/Louis G. McBryan, Attorney for Debtor/Plaintiff | | |
| DATE<br>01/31/2017 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Louis G. McBryan | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## IN THE U.S. BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **BAVARIA YACHTS USA, LLLP** | )    **CHAPTER 11** |
| | ) |
| Debtor. | )    **CASE NO. 16-68583-jrs** |
| | ) |
| **BAVARIA YACHTS USA, LLLP,** | )    **ADVERSARY PROCEEDING** |
| | )    **NO. 17-_____** |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **BAVARIA YACHTBAU GmbH,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

COMES NOW, Bavaria Yachts USA, LLLP ("Plaintiff" or alternatively, "Debtor" or "BUSA"), Debtor and Debtor In Possession in the above styled case, and files this Complaint against Bavaria Yachtbau GmbH ("Bavaria Yachtbau", "Yachtbau" or "Defendant") and respectfully shows the Court as follows:

### VENUE AND JURISDICTION

1.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(B)(F)(K) and (0).

2.

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

3.

Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409, as this is an adversary proceeding arising in and related to the Debtor's Chapter 11 Case, Case No. 15-68583-jrs which is pending in the Bankruptcy Court for the Northern District of Georgia, Atlanta, Division.

4.

This adversary proceeding is brought pursuant to 11 U.S.C. §§ 502, 510, 544, 547, 548, 550, 551 of the United States Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure and other applicable statutes and laws.

5.

BUSA as the Debtor in possession has the rights, powers and duties of BUSA. 11 U.S.C. § 704.

6.

Defendant Bavaria Yachtbau GmbH is a German corporation with its principal place of business in Giebelstadt, Germany, and which sells and delivers goods in these United States. Bavaria Yachtbau is subject to jurisdiction and venue in this Court and may be served c/o its counsel of record Richard Robbins, Esq., Robbins Ross Alloy Belinfante Littlefield LLC, 999 Peachtree Street NE, Suite 1120, Atlanta, GA 30309.

7.

The Bankruptcy Court has personal jurisdiction over a foreign corporation "if the exercise of jurisdiction is consistent with the Constitution and laws of the U.S." Fed. R.Bankr.P. 7004(f). Bavaria Yachtbau has filed Proof of Claims in this case, Claims No.'s 26 and 27, and has appeared in multiple matters pending before this Court.

## SUMMARY OF MATERIAL FACTS

8.

BUSA is a Georgia limited liability limited partnership company with its principal place of business in Atlanta, Georgia. BUSA was the exclusive distributor for Bavaria Yachtbau's motor and sailing yachts in the U.S.

9.

Bavaria Yachtbau GmbH is a German corporation with its principal place of business in Giebelstadt, Germany. Bavaria Yachtbau is a manufacturer of motor and sailing yachts.

10.

Bavaria Yachtbau GmbH is one of the world's largest yacht manufacturers making both sailboats and motor yachts, and has for many years dominated the European market in both. In 2007, U.S. private equity investor, Bain Capital acquired the company from its German founders, and soon thereafter transferred control to the U.S. private equity investors Anchorage Advisors and Oaktree Capital ("Oaktree/ Anchorage").

11.

In 2010, Bavaria Yachtbau, under the direction of the new Oaktree/ Anchorage-hired CEO Jens Ludmann, sought to expand its global market share by bringing its well-known European brand to the U.S. At that point in time, there was no active sales or distribution of Bavaria Yachtbau's products in the U.S.

12.

In late 2010, Yachtbau entered into negotiations and discussions with Kenny Feld ("Feld") and his partners Andrew Thompson and Sylvia Driver to establish a dealership for its sailboats in the U.S., including Alaska and Hawaii, excepting California, Oregon, and Washington states.

13.

Kenny Feld and his partners formed Horizon Bavaria USA, LLC a Georgia corporation with it principal place of business in Atlanta, Georgia, and on January 17, 2011, entered into a Dealer Contract ("Original Sailboat Dealer Contract") with Bavaria Yachtbau to promote and sell sailing yachts and related equipment and accessories in the U.S. manufactured by Bavaria Yachtbau. The Original Dealer Contract was assigned by Horizon Bavaria USA, LLC to Horizon Bavaria USA, LLLP, which ultimately made a registered name change to Bavaria Yachts USA, LLLP (referred to collectively as "BUSA") on March 8, 2011. The Original Dealer Contract was later replaced by another Dealer Contract ("Second Sailboat Dealer Contract") on November 8, 2011.

14.

Feld and his partners funded the new startup company with $100,000 of debt investment, and then raised an additional $875,000 in unsecured debt financing from friends and family, and later approximately $1,200,000 in financing for the first 6 sailboats in inventory. BUSA financed all the inventory boats with their own private notes because, at the time, there was no commercial lending available to a new brand of sailboats in the U.S. The Sailboat Dealer Contracts were exclusive which meant that BUSA agreed not to sell products which would compete with Bavaria Yachtbau. Likewise, Bavaria Yachtbau agreed to refrain from granting anyone else the rights to sell Bavaria Yachtbau products in the U.S., and to further refrain from actively directly selling products to end–customers in the U.S.

15.

BUSA opened up its first office in Annapolis June 2011 and premiered Bavaria Yachtbau's sailboats to the U.S. market at the Annapolis Sailboat Show (the largest sailboat show in the U.S.)

4

that October. The relationship between BUSA and Bavaria Yachtbau started off well. Bavaria Yachbtbau was supportive in marketing and branding. Both BUSA and Bavaria Yachtbau knew that the huge U.S. market could be quite lucrative, but also very demanding in what the U.S. consumer expected of luxury products such as yachts. To that end, both BUSA and Bavaria Yachtbau knew there would be a steep hill to climb to get the boats properly fitted to meet the demands of the U.S. luxury consumer. BUSA made it abundantly clear, that without meeting the specific needs the U.S. consumer, the brand would never succeed here. Bavaria Yachtbau made promises, both verbally and through emails, to BUSA that it would meet the demands of the U.S. consumer by properly fitting the boats to the market.

**Yachtbau induced BUSA to heavily invest in growth in order to sell Yacthbau's boats and build the Yachtbau brand in the U.S. market.**

16.

In April 2013, Constantin von Bulow, a senior vice president of Oaktree Capital Management, became the new CEO of Bavaria Yachtbau. On May 15, 2013, based on continued confidence in BUSA's investments, brand building, and customer satisfaction, Bavaria Yachtbau and BUSA amended the Second Dealer Contract ("Amendment to Second Sailboat Dealer Contract"). Importantly, the Amendment to Second Dealer Contract

a.  reflected the growth of the U.S. dealership to include California, Oregon, and Washington states;

b.  added related entities for the dealerships expansions into the eastern seaboard states to include Horizon Bavaria Annapolis, LLLP, Bavaria Yachts Connecticut, LLP;

c.  extended the Original Sailboat Dealer Contract to a period of ten years running until January 1, 2021;

d.   and delineated a national Distribution Plan of projected growth through the term of

the contract.

17.

At this time, BUSA invested another $350,000 based upon the strength of the extended

commitment with Bavaria Yachtbau. Bavaria Yachtbau was very aware that this additional BUSA

capital investment was based on Bavaria Yachtbau's extended commitment to the partnership, as

well as commitment to accelerate the remediation of numerous design flaws that had been well

documented over the first 2 years of the partnership.

18.

But as unit sales of sailboats began to increase, product and support problems began to

compound for BUSA. Owners who purchased boats, increasingly came back to BUSA with a host

of issues that BUSA diligently resolved. BUSA repeatedly documented and reported to Bavaria

Yachtbau the clear design and quality flaws that caused these repeating issues. Bavaria Yachtbau

management continued to reassure and promise increased commitment to resolve these product

defects. While incremental improvements were made, progress was very slow, and BUSA found

that an increasing amount of its time and money went into the pre-sale re-fitting and repair of these

known design flaws of the European sailboats to make them suitable to the U.S. consumer.  BUSA

suffered the increasing burden of after-sales support.  Nonetheless, BUSA endured and continued

to invest, due to continued promises from Bavaria Yachtbau to remedy root cause design flaws as

well as to stand behind the financial agreement whereby BUSA's after-sales support costs would

not exceed the 2% allowance built into the dealer agreement.

19.

By the end of 2013, unit sales were on the rise, and although product issues persisted, the trust built with management teams under Jens Luhdman and then under Constantin von Bulow, along with continued assurances that lingering product defects would be finally resolved, plus an extended partnership agreement for sailboats, the path forward appeared challenging but encouraging. On the strength of the continued investment of BUSA and the deep confidence Bavaria Yachtbau implied it had in BUSA, Bavaria Yachtbau repeatedly solicited Feld and an additional business partner, to make further investments, to take on additional development, and promote its motor yacht brand in the U.S. under the same business model as its exclusive distributor.

20.

In the Spring of 2014, the parties began negotiations to expand BUSA's exclusive dealership in the U.S. to include Bavaria Yachtbau's motor yachts.  Like its sailboats, Bavaria Yachtbau's motor yachts were also very successful, dominating the European market for motor yachts in the 30-56-foot range.  As a result, Kenny Feld and his partners formed Bavaria Motor Yachts USA, LLC, a Florida Corporation with its principal place of business in Dania Beach, Florida.  On September 24, 2014, BUSA entered into a Dealer Contract ("Motor Yacht Dealer Contract") to promote and sell motor yachts and related equipment and accessories in the U.S. manufactured by Bavaria Yachtbau.  In 2015, Bavaria Motor Yachts, USA, LLC, merged with and into Bavaria Yachts USA, LLLP ("BUSA").

21.

Like the Sailboat Dealer Contract, the Motor Yacht Dealer Contract was exclusive. BUSA agreed not to sell products which would compete with Bavaria Yachtbau.  Likewise, Bavaria

7

Yachtbau agreed to refrain from granting anyone the rights to sell Bavaria Yachtbau products in the U.S., and refrain from actively directly selling products to end customers in the U.S.

22.

Based on experiences with Sailboat product design flaws, both Bavaria Yachtbau and Bavaria Motor Yachts USA, LLC agreed that the Bavaria Yachtbau motor yachts in some ways were not yet basically operational for the U.S. market. As a result, BUSA included in the Amended Motor Yacht Dealer Contract specific items which Bavaria Yachtbau acknowledged to be problems which it agreed to fix, including:

    a.  110 volt electrical systems that operate and conform to the U.S. Coast Guard Standards; and

    b.  the factory-offered air-conditioning systems that operated properly; and

    c.  providing a crucial wiring diagram of the boats' electrical systems.

23.

Additionally, Bavaria Motor Yachts USA, LLC began to identify and document numerous certain items which the U.S. motor yacht consumer, especially one spending approximately $500,000 on a luxury item, demanded, including: a generator that would work consistently and when more than one electrical device was operated at once; a breaker box that was accessible to the owner when the generator tripped the breaker; and a toilet they could fit onto, among other issues on a growing list added to those in the dealer contract. These items were acknowledged by Bavaria Yachtbau and agreed to prioritize these product improvements, in order for BUSA to invest additional capital and resources to begin to build the Bavaria Yachtbau brand for motor yachts in the U.S. market.

24.

To fund the additional growth of the business based on the new Motor Yachts Dealer Contract that Bavaria Yachtbau induced BUSA to enter, BUSA made an initial equity investment of more than $300,000, plus another $300,000 in debt investment secured by BUSA, and finally another equity round of investment totaling $1,450,000 finalized in mid-2015. In sum, in 2014 and 2015, an additional total of $2,050,000 was invested by numerous individuals based on the commitments made by Bavaria Yachtbau to induce BUSA to undertake the building of the brand and U.S. market for Bavaria Yachtbau's motor yacht products. Including the initial investments made in 2011-2012, plus the interim investments made in 2013 plus the investments made related to the new motor yacht business launch, by the end of 2015 the total capital invested in growing BUSA's business and in growing Bavaria Yachtbau's brand presence and U.S. volume and market share, totaled more than $4,500,000.

**Yachtbau continued to avoid fixing the defects, continued to mislead BUSA, and ultimately forced BUSA out of business.**

25.

In January 2015, Lutz Henkel took over the CEO position at Bavaria Yachtbau. In both the Sailboat Dealer Contracts as well as the Motor Yacht Dealer Contracts, Bavaria Yachtbau required BUSA to carry out customer service work, warranty work, maintenance work, and repair work for the boats as requested by the purchasers/ owners of those boats. BUSA was obligated to pay for all of that out of its own pocket and provided a 2% lump sum discount from Bavaria Yachtbau from BUSA's purchase price of the boat. Bavaria Yachtbau knew or should have known, and was communicated to by BUSA repeatedly, that the 2% lump sum discount off the wholesale purchase price would never cover the massive amount of customer service work, maintenance work, and repair work costs required for the boats it delivered to BUSA. Bavaria

Yachtbau continued to commit to resolve the underlying design flaws, and to stand behind Bavaria Yachtbau's responsibility for all support costs above the 2% limit.

26.

The customer service work, maintenance work, and repair work costs greatly exceeded 2% of the retail purchase price of the boats. In many cases, motor yachts would exceed the 2% limit after being in the field for less than 6 months and continued to spiral to reach 5%. BUSA laid out the cash with assurances that Bavaria Yachtbau would eventually reimburse BUSA for all costs beyond the 2% obligation.

27.

Early on, and often, Mr. Henkel promised verbally and in emails to accelerate Bavaria Yachtbau's support to remedy the defects in Bavaria Yachtbau's boats sent to the U.S. market. The continued defects of the Bavaria Yachtbau boats, coupled with the increase in Bavaria Yachtbau motor yacht owners in the U.S., lead to a considerable outlay of cash from BUSA (well over the 2% discount) to fix the pandemic problems and keep the new owners from suing. When building a brand in a new market, keeping word of mouth positive is critical. Bavaria Yachtbau was making that nearly impossible. The design and manufacturer defects included, but are not limited to the following:

> a. Significant leaks and near sinking on numerous occasions due to through hulls, deck fittings, and internal system hoses not properly sealed and/ or secured;
>
> b. Persistent failures of the air conditioning units;
>
> c. Persistent failures of the generator sets;
>
> d. Persistent failures of the electrical systems;
>
> e. Motor yacht engine rooms excessively and prematurely rusting;

f.  Fire suppression system failures.

28.

Bavaria Yachtbau knew or should have known of the myriad manufacturer defects prior to entering into the Motor Yacht agreements with BUSA, but failed to inform BUSA of those defects and deficiencies to induce it to enter into the agreements.

29.

BUSA continued to pay out of pocket to repair the defective boats, well above the 2% discount.  The number of owners demanding to return their boats, fed up with the persistent and dangerous defects grew out of control.  The financial effect to BUSA was devastating.  BUSA begged Bavaria Yachtbau to provide technical and financial support.  Bavaria Yachtbau responded with further empty promises to fix the problems.  All the while, BUSA got deeper and deeper in the financial hole of fixing Bavaria Yachtbau's defective boats.  Additionally, the quality strides that had been made on sailboats, actually started to deteriorate under Mr. Henkel's management team. Customer-ordered boats that were delivered to BUSA in the summer of 2016 had numerous defects including major leaks that would have sunk the boat had they not been immediately detected, the rigging systems for the wrong models sent with the boats, continued electrical and air conditioning system defects. BUSA continued to be crushed by the process of making these issues right for the new boat owners, with poor to no financial or technical support from Bavaria Yachtbau under the new management team.

30.

Bavaria Yachtbau continual failure to send technical or financial support forced BUSA into an economic crisis, resulting in a "payables gap" between BUSA and Bavaria Yachtbau under the terms in place.  Furthermore, with new inventory and show models consistently out of commission

in need of repeated repairs and re-fitting, BUSA was finding it next to impossible to sell additional units, even at deeply discounted prices. Often boat systems would fail before or during boat shows, often boats would be out of commission for repairs during critical "test-drive" time windows following shows, and BUSA was consistently forced to cancel or postpone test-drive appointments made by serious prospective buyers (most of whom don't offer second chances).

31.

Bavaria Yachtbau's CEO, Lutz Henkel clearly knew of how the Bavaria Yachtbau design defects were making it nearly impossible for BUSA to sell boats, forcing BUSA to spend its own money to refit and repair these boats, creating a payables gap that began to grow in the second quarter of 2016, and increasingly limiting BUSA's ability to invest further working capital to plug the unrelenting gaps caused by Bavaria Yachtbau's systemic and unaddressed product defects.

32.

As this crisis for BUSA grew, BUSA met in person with Bavaria Yachtbau on numerous occasions.  All of the following meetings included detailed documentation of the issues, BUSA's urgent pleas for Bavaria Yachtbau to remedy the problems, and BUSA's warnings of the unmistakable consequences of Bavaria Yachtbau's inaction to resolve product defects:

      a.    January 2016 meetings with the CEO and numerous Bavaria Yachtbau management members during the Dusseldorf Boat Show;

      b.    February 2016 numerous meeting with CEO and Bavaria Yachtbau's new Head of Sales at the Miami Boat Show;

      c.    April 2016 meetings in Annapolis, Maryland with Bavaria Yachtbau CEO and CFO;

      d.    May 2016 meeting with CEO in Detroit, Michigan; and

e.  again in June 2016 by phone with the CEO.

33.

In July 2016, after reviewing a detailed power point presentation summary from Mr. Feld, Lutz Henkel convinced Mr. Feld that Bavaria Yachtbau was going to finally fix the design and manufacture defects, as well as work together with BUSA on a constructive resolution to the well-understood and growing payables gap. He urged Mr. Feld to fly to Giebelstadt, Germany (where the Bavaria Yachtbau factory is located) to meet with him in person to work out the details of a resolution of all the issues that had been pressed by BUSA over the previous 6-month period.

34.

Mr. Feld flew to Germany where instead Lutz Henkel induced BUSA to sign an agreement wherein BUSA immediately would pay Bavaria Yachtbau $173,000 USD and €156,000 EURO, and agree to pay 100% of all boat revenues directly to Bavaria Yachtbau. In exchange, Bavaria Yachtbau agreed to "loan-back" to BUSA cash funds to cover its monthly operational costs, and finally send a Bavaria Yachtbau team to go through all BUSA stock boats and fix them. BUSA made the significant good-faith cash payments to Bavaria Yachtbau immediately, but Bavaria Yachtbau refused (or never intended) to honor its side of the agreement, both by continuing to take no real action or investment to fix the defective boat, and also by avoiding urgent communications about promised short-term operational cash arrangements. Moreover, Bavaria Yachtbau then refused to take any more orders for boats from BUSA, knowing that BUSA could never close the payables gap without the ability to sell defect-free inventory boats nor the ability to submit new customer order.

35.

Lutz Henkel had opportunistically decided to change course and use the long-understood payables gap as an excuse to force BUSA out of business, avoid investing in fixing the myriad product defects, avoid reimbursing BUSA as promised for the significant money invested in resolving constant customer support issues caused by these well-documented flaws, so that he could form a clean-slate new U.S. dealership network, not the exclusive dealership he inherited, and without the incumbent responsibilities Bavaria Yachtbau had repeatedly failed to resolve in the BUSA partnership.

36.

Simultaneously, but unbeknownst to BUSA at the time, Bavaria Yachtbau began actively soliciting numerous other dealers in the U.S. to take over BUSA's business, despite the existence of the exclusive dealership agreements. Further, Bavaria Yachtbau allowed BUSA to set up for the October 2016, Annapolis Sailboat Show where it would display 5 Bavaria Yachtbau sailboats, at a cost to BUSA of over $80,000. After complicated and expensive show display was set up, Lutz Henkel, on the first day of the Annapolis Sailboat Show, five minutes before the 5-day show started, walked down the docks to the BUSA display, and handed Mr. Feld a letter (dated two days earlier) terminating all agreements between Bavaria Yachtbau and BUSA.

37.

Over the course of 5 years, BUSA ultimately invested well over $5,000,000 of its own capital solely to build the brand presence in the U.S. for Bavaria Yachtbau's products, build a dedicated national sales network, and ensure that Bavaria boat owners enjoyed high customer-satisfaction necessary to build a new brand in the marketplace. BUSA invested in, and established additional regional sales centers in Connecticut (2012), California (2013), and Florida (2014), plus

14

an administrative office in Georgia (2014). BUSA built a staff of up to 10 full-time employees and

contractors. BUSA grew annual sales in years 2011-2015 as follows: 2 units in 2011, 3 units in

2012, 9 units in 2013, 10 units in 2014, and 15 units in 2015. As a result of Bavaria Yachtbau's

inducement of BUSA to enter into agreements to sell boats Bavaria Yachtbau knew or should have

known were defective, and Bavaria Yachtbau's continual but hollow promises to fix the defective

boats, and sudden termination of any rights of BUSA to sell Bavaria Yachtbau boats (BUSA's sole

dedicated business purpose), BUSA was forced to file for Chapter 11 Bankruptcy on October 18,

2016.

38.

BUSA was also left holding an inventory of 10 boats, in which BUSA had well over

$1,000,000 in working capital invested. The estimated Fair Market Value of this inventory was

over $5.5 million. Yet, with the brand and goodwill BUSA had invested in for years, destroyed

within a month by the actions of Bavaria Yachtbau, the value of this same inventory has been

decreased by at least $2 million, and likely even more because BUSA was no longer able to service

the defective boats. Furthermore, following its Bankruptcy filing, Bavaria Yachtbau continually

thwarted BUSA's efforts to sell these inventory boats as part of the bankruptcy estate. Specifically,

Bavaria Yachtbau learned of potential purchases, then contacted the potential buyer and/ or the

broker and threatened unspecified legal action if they participated in the deal. Because of Bavaria

Yachtbau's actions, BUSA has been unable to sell any of the stock boats in the bankruptcy estate.

## COUNT I
## FRAUD IN THE INDUCEMENT

39.

BUSA hereby re-alleges and incorporates the allegations contained in paragraphs 1

through 38 of this Complaint as if the same were set forth herein verbatim.

15

40.

In May 2013, Bavaria Yachtbau knowingly made false statements of material facts to Horizon Bavaria that its sailboats were free from design and manufacture defects, and that the 2% discount would cover all customer service work, maintenance work, and repair work costs.

41.

Bavaria Yachtbau intended the statements to induce BUSA to act upon those statements by entering into agreements with it.

42.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

43.

In September 2014, Bavaria Yachtbau made false statements of material fact to BUSA that its motor yachts were free from design and manufacture defects, and that the 2% discount would cover all customer service work, maintenance work, and repair work costs.

44.

Bavaria Yachtbau intended the statements to induce BUSA to act upon those statements by entering into agreements with it.

45.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

46.

In October 2014, Bavaria Yachtbau made false statements of material fact to BUSA that it would fix the boats' electrical systems to conform with basic operational and safety standards; and fix the boats' factory-offered air conditioning system so that it operated properly.

47.

Bavaria Yachtbau intended the statements to induce BUSA to act upon those statements by entering into agreements with it.

48.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

49.

In July 2016, Bavaria Yachtbau made false statements of material fact to BUSA that it would pay BUSA to cover its monthly operational costs and send a Bavaria Yachtbau team to go through all BUSA stock boats and fix them.

50.

Bavaria Yachtbau intended the statements to induce BUSA to act upon those statements by entering into agreements with it.

51.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

## COUNT II
## NEGLIGENT MISREPRESENTATION
### (Plead in the Alternative)

52.

BUSA hereby re-alleges and incorporates the allegations contained in paragraphs 1 through 51 of this Complaint as if the same were set forth herein verbatim.

53.

In May 2013, Bavaria Yachtbau made statements of material fact to BUSA, which it may have believed to be true, but which in fact was false, which but for its negligence it should have known to be false, that its sailboats were free from design and manufacture defects; and that the 2% discount would cover all customer service work, maintenance work, and repair work costs.

54.

Bavaria Yachtbau intended the statements to induce BUSA to act upon those statements by entering into agreements with it.

55.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

56.

In September 2014, Bavaria Yachtbau made false statements to BUSA, made statements of material fact to Horizon Bavaria, which it may have believed to be true, but which in fact was false, which but for its negligence it should have known to be false, that its motor yachts were free from design and manufacture defects, and that the 2% discount would cover all customer service work, maintenance work, and repair work costs.

57.

Bavaria Yachtbau intended the statements to induce BUSA to act upon those statements by entering into agreements with it.

58.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

59.

In October 2014, Bavaria Yachtbau made false statements to BUSA, made statements of material fact to Horizon Bavaria, which it may have believed to be true, but which in fact was false, which but for its negligence it should have known to be false that it would fix the boats' electrical systems to conform with basic operational and safety standards; and fix the boats' factory-offered air conditioning system so that it operated properly.

60.

Bavaria Yachtbau intended the statements to induce BUSA to act upon those statements by entering into agreements with it.

61.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

62.

In July 2016, Bavaria Yachtbau made false statements to BUSA, made statements of material fact to BUSA, which it may have believed to be true, but which in fact was false, which but for its negligence it should have known to be false that it would pay BUSA to cover its monthly

operational costs and send a Bavaria Yachtbau team to go through all BUSA stock boats and fix them.

63.

Bavaria Yachtbau intended the statement to induce BUSA to act upon those statements by entering into an agreement with it.

64.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

### COUNT III
### UNJUST ENRICHMENT
### (Plead in the Alternative)

65.

BUSA hereby re-alleges and incorporates the allegations contained in paragraphs 1 through 64 of this Complaint as if the same were set forth herein verbatim.

66.

There is a lack of adequate remedy under the law.

67.

BUSA conferred a benefit upon Bavaria Yachtbau, which it appreciated, by bringing its brand to the U.S. market, growing the brand awareness in the U.S. market, establishing a thriving U.S. market for Bavaria Yachtbau's products, marketing Bavaria Yachtbau's product at over 40 boat shows over the course of 5 years, and selling dozens of Bavaria Yachtbau's boats, and diligently resolving a crushing number of product support problem to keep boat owner satisfaction high nonetheless.

20

68.

It would be inequitable for Bavaria Yachtbau to retain the benefit BUSA conferred upon it without paying the value thereof.   Therefore, Yachtbau is liable to BUSA for unjust enrichment in an amount to be proved but not less than $3,000,000.00.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

69.

BUSA hereby re-alleges and incorporates the allegations contained  in paragraphs 1 through 68 of this Complaint as if the same were set forth herein verbatim.

70.

BUSA bought, and Bavaria Yachtbau sold, numerous sailboats through the privity of the Sailboat Dealer Agreements.

71.

Bavaria Yachtbau impliedly warranted that the sailboats were merchantable, i.e. fit for the ordinary purpose for which sailboats are generally used.

72.

The sailboats contained manufacturer and design defects, and were not reasonably fit for the purposes intended.

73.

BUSA repeatedly notified Bavaria Yachtbau of its breach of the implied warranty of merchantability within a reasonable time after learning of such breaches.

74.

As a direct and proximate result of Bavaria Yachtbau's breach of the implied warranty of merchantability, BUSA has suffered damages.

75.

BUSA bought, and Bavaria Yachtbau sold, numerous motor yachts through the privity of the Motor Yacht Dealer Agreements.

76.

Bavaria Yachtbau impliedly warranted that the motor yachts were merchantable, i.e. fit for the ordinary purpose for which motor yachts are generally used.

77.

The motor yachts contained manufacturer and design defects, and were not reasonably fit for the purposes intended.

78.

BUSA repeatedly notified Bavaria Yachtbau of its breach of the implied warranty of merchantability within a reasonable time after learning of such breaches.

79.

As a direct and proximate result of Bavaria Yachtbau's breach of the implied warranty of merchantability, BUSA has suffered damages.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

80.

BUSA hereby re-alleges and incorporates the allegations contained in paragraphs 1 through 79 of this Complaint as if the same were set forth herein verbatim.

81.

Horizon Bavaria bought, and Bavaria Yachtbau sold, numerous sailboats through the privity of the Sailboat Dealer Agreements.

22

82.

Bavaria Yachtbau knowingly sold the sailboats for a particular purpose: for use by the U.S. consumer and relied upon Bavaria Yachtbau's judgment.

83.

The sailboats contained manufacturer and design defects, and were not reasonably fit for the particular purposes.

84.

BUSA repeatedly notified Bavaria Yachtbau of its breach of the implied warranty of merchantability within a reasonable time after learning of such breaches.

85.

As a direct and proximate result of Bavaria Yachtbau's breach of the implied warranty of fitness for a particular purpose, BUSA has suffered damages.

86.

BUSA bought, and Bavaria Yachtbau sold, numerous motor yachts through the privity of the Motor Yacht Dealer Agreements.

87.

Bavaria Yachtbau knowingly sold the motor yachts for a particular purpose: for use by the U.S. consumer and relied upon Bavaria Yachtbau's judgment.

88.

The motor yachts contained manufacturer and design defects, and were not reasonably fit for the particular purpose.

89.

BUSA repeatedly notified Bavaria Yachtbau of its breach of the implied warranty of fitness for a particular purpose within a reasonable time after learning of such breaches.

90.

As a direct and proximate result of Bavaria Yachtbau's breach of the implied warranty of fitness for a particular purpose, BUSA has suffered damages.

## COUNT VI
## TORTIOUS INTERFERENCE

91.

BUSA hereby re-alleges and incorporates the allegations contained in paragraphs 1 through 90 of this Complaint as if the same were set forth herein verbatim.

92.

Following BUSA's petition for bankruptcy, BUSA attempted to sell boats it held in the bankruptcy estate, but no longer had sales people in its employ. As a result, BUSA established business relationships with independent yacht brokers to sell the boats.

93.

Bavaria Yachtbau learned of those business relationships. Bavaria Yachtbau intentionally and unjustifiably took action to interfere with BUSA's business relationship with those independent yacht brokers, threatening unspecified and unfounded legal action against the yacht brokers. As a result, those independent yacht brokers refused to sell BUSA's boats and BUSA suffered damages as a direct result of Bavaria Yachtbau's interference.

94.

Additionally, BUSA was contacted directly by buyers interested in buying boats held by BUSA. Bavaria Yachtbau learned of these buyers. Bavaria Yachtbau intentionally and

unjustifiably took action to interfere with BUSA's business relationship with those buyers, threatening unspecified and unfounded legal action. Thus, those buyers refused to buy BUSA's boats. BUSA suffered damages as a direct result of Bavaria Yachtbau's interference.

### COUNT VII
### AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS
### (Pursuant to 11 U.S.C. §§ 547 and 550)

95.

BUSA incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 94 of this Complaint.

96.

Sections 547(b) and 550(a) of the Bankruptcy Code empower the Debtor in possession for the benefit of the estate, to avoid and recover a transfer to a creditor of an interest of the debtor in property if the requirements set forth therein are met.

97.

Pursuant to section 547(b) of the Bankruptcy Code, BUSA may avoid any transfer of an interest of the debtor in property:

    a.   To or for the benefit of a creditor;

    b.   For or on account of an antecedent debt owed by the debtor before such transfer was made;

    c.   Made while the debtor was insolvent;

    d.   Made: (A) one or within 90 days before the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    e.   That enables such creditor to receive more than such creditor would receive    if:

(A) the case was a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

98.

During the 90-day period prior to the Petition Date (the "<u>Preference Period</u>"), Debtor made one or more transfers by check, cash, wire transfer, or its equivalent, in an aggregate amount of not less than $663,933.98 directly to or for the benefit of the Defendant (the "<u>Preferential Transfers</u>"). To the extent the BUSA discovers the existence of additional transfers to Defendant within the Preference Period, the BUSA intends to recover all such transfers, and this Complaint is not limited to those transfers disclosed as part of the defined term "Preferential Transfers."

99.

Each of the Preferential Transfers was a transfer of an interest of Debtor in property.

100.

Defendant was a creditor of the Debtor at the time of the Preferential Transfers within the meaning of 11 U.S.C. § 101(10)(A). At the time of the Preferential Transfers, Defendant had a right to payment on account of an obligation owed to Defendant by Debtor.

101.

The Preferential Transfers were to or for the benefit of Defendant within the meaning of 11 U.S.C. § 547(b)(1) as the Preferential Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

102.

The Preferential Transfers were made on account of an antecedent debt as the Transfers were on account of a debt obligation for which Debtor was bound to pay Defendant before the

26

Transfers were made.

103.

Pursuant to section 547(f) of the Bankruptcy Code, Debtor is presumed insolvent during the 90-day Preference Period.

104.

Debtor was insolvent throughout the Preference Period within the meaning of sections 101(32)(A) and 547(b)(3) of the Bankruptcy Code, in that the sum of its debts was greater than the fair value of its assets.

105.

As a result of the Preferential Transfers, the Defendant received a greater percentage of its claim from Debtor than it would have if the Preferential Transfers had not been made and if the Defendant had participated in the distribution of the assets of the Estate with all the other creditors as provided by the provisions of the Bankruptcy Code.

106.

The Defendant is the initial transferee of the Preferential Transfers or the entity for whose benefit the Preferential Transfers were made.

107.

The Debtor in Possession may avoid all Preferential Transfers, including but not limited to the amount set forth in Paragraph 22 of this Complaint, made to Defendant from Debtor during the Preference Period pursuant to 11 U.S.C. § 547.

108.

Accordingly, the Debtor in Possession is entitled to avoid and recover the Preferential Transfers made to the Defendant, together with pre-judgment interest, as well as post-judgment

interest as allowed by law from the date of the entry of the judgment until paid. 11 U.S.C. §§ 547, 550 and 551.  In accordance with the foregoing, the Transfers are avoidable as preferential transfers pursuant to 11 U.S.C. Section 547(b).  To the extent the Transfers are avoided, they may be recovered by BUSA pursuant to 11 U.S.C. Section 550.

## COUNT VIII
### AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS
### (Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550)

109.

BUSA incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 108 of this Complaint.

110.

Section 548(a)(1)(B) of the Bankruptcy Code empowers a BUSA, for the benefit of the estate, to avoid a transfer to a creditor of an interest of the debtor in property if the requirements set forth therein are met.

111.

Pursuant to section 548(a)(1)(A) of the Bankruptcy Code, a BUSA may avoid a transfer to a creditor of an interest of the debtor in property if such transfer is made on or within two years of the filing of the bankruptcy petition with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted.

112.

On or within two years of the Petition Date, Debtor made transfers of money or property of Debtor to or for the benefit of Defendants, in an amount of not less than $663,933.98 together with those transfers identified as Preferential Transfers above (such transfers,

28

collectively, the "Fraudulent Transfers"). To the extent that BUSA discovers the existence of

additional transfers to Defendants on or within the two years prior to the Petition Date, BUSA

intends to recover all such transfers, and this Complaint is not limited to those transfers

disclosed as part of the defined term "Fraudulent Transfers."

113.

Each of the Fraudulent Transfers was made with actual intent to hinder, delay, or

defraud an entity or entities to which Debtor was or became indebted on or after the date of the

Fraudulent Transfers.

114.

Debtor transferred to Defendant funds totaling $663,933.98 (the "Fraudulent Transfers")

within two years before the Petition Date.

115.

Defendant was the initial transferee of the Fraudulent Transfers.

116.

Debtor received less than reasonably equivalent value in exchange for each of the

Fraudulent Transfers.

117.

At all times relevant hereto, Debtor was insolvent in that the sum of its debts was greater

than the fair value of its assets, or the Debtor became insolvent as a result of each of the

Fraudulent Transfers.

118.

At all times relevant hereto, Debtor intended to incur, or reasonably should have believed

that Debtor would incur debts that would beyond Debtor's ability to pay as such debts matured.

29

Defendant did not act in good faith.

119.

Defendant knew or should have known that Fraudulent Transfers were fraudulent.

120.

Defendant failed to conduct any due diligence prior to accepting the Fraudulent Transfers.

121.

Accordingly, pursuant to sections 548(a)(1)(B) and 550 of the Bankruptcy Code, BUSA is entitled to avoid and recover the Fraudulent Transfers from Defendant together with pre-judgment interest, as well as post-judgment interest as allowed by law from the date of the entry of the judgment until paid.

## COUNT IX
### FRAUDULENT TRANSFERS UNDER STATE LAW
(O.C.G.A. § 18-2-70, et seq.; 11 U.S.C. § 544; 11 U.S.C. § 550)

122.

BUSA incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 121 of this Complaint.

123.

On or within four years of the Petition Date, Debtor made transfers of money or property of Debtor to or for the benefit of Defendant, including the Fraudulent Transfers described above (such transfers, collectively, the "State Law Fraudulent Transfers"). To the extent that BUSA discovers the existence of additional transfers to Defendant on or within the four years prior to the Petition Date, BUSA intends to recover all such transfers, and this Complaint is not limited to those transfers disclosed as part of the defined term "State Law Fraudulent Transfers."

124.

Each of the State Law Fraudulent Transfers was made with actual intent to hinder, delay, or defraud entities to which Debtor was or became indebted on or after the date of the State Law Fraudulent Transfers.

125.

Defendant was the initial transferee with respect to the Fraudulent Transfers.

126.

Debtor received less than reasonably equivalent value in exchange for the State Law Fraudulent Transfers.

127.

Defendant did not act in good faith.

128.

Defendant knew or should have known that the Fraudulent Transfers were fraudulent. Defendant failed to conduct any due diligence prior to accepting the State Law Fraudulent Transfers.

129.

At all times relevant hereto, Debtor was insolvent in that the sum of its debts was greater than the fair value of its assets, or the Debtor became insolvent as   a result of each of the Fraudulent Transfers.

130.

At all times relevant hereto, Debtor intended to incur, or reasonably should have believed that Debtor would incur debts that would beyond Debtor's ability to pay as such debts matured.

131.

Accordingly, pursuant to O.C.G.A. § 18-2-70, et seq. and Sections 544 and 550 of the Bankruptcy Code, BUSA is entitled to avoid and recover the Fraudulent Transfers from Defendant together with pre-judgment interest, as well as post-judgment interest as allowed by law from the date of the entry of the judgment until paid.

## COUNT X
## CLAIM TO DETERMINE VALIDITY, PRIORITY OR EXTENT OF YACHTBAU'S INTEREST IN THE 10 BOATS

132.

BUSA incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 131 of this Complaint.

133.

The Court's determination of the validity, priority, or extent of a creditor's liens asserted against property of the estate is a core proceeding under 11 U.S.C. Section 157(b)(2)(k).

134.

The Court may declare the rights of any interested party seeking the declaration, and the declaration shall have the force and effect of a final judgment. 28 U.S.C. Section 2201(a).

135.

Pursuant to Federal Rule of Bankruptcy Procedure 7001(2), the Court can entertain a declaratory action to determine the priority, validity, or extent of a lien or other interest in property of the estate.

136.

A declaratory judgment provides a remedy to a party who is uncertain of its rights and seeks the court's determination of those rights.

137.

Bavaria Yachtbau has filed a secured claim in this bankruptcy case citing the 10 Boats as the security for this claim. In this same claim, Number 26, it asserts that it holds the title to each of the 10 Boats.

138.

Bavaria Yachtbau delivered these 10 Boats to BUSA pursuant to the terms of the Agreement(?) for sale and delivery to potential buyers.

139.

BUSA lists the 10 Boats in its schedules as its unencumbered property.

140.

Bavaria Yachtbau does not have a perfected security interest in the 10 Boats as it has not taken any steps to perfect such an interest. Bavaria Yachtbau does not hold the title to the 10 Boats.

141.

An actual and justiciable dispute exists regarding the validity of the lien Bavaria Yachtbau claims to hold against the 10 Boats in the possession of BUSA and whether Bavaria Yachtbau holds the title to each of the 10 Boats.

142.

The declaratory judgment sought by BUSA is not duplicative of other matters to be resolved as part of the claims in this action. Of necessity in fact is the Court's resolution of these issues at the outset of this action is necessary to the Court's determination of the remaining claims brought herein.

143.

A judicial determination and declaration is therefore required to declare that Bavaria Yachtbau does not have title to the 10 Boats; Bavaria Yachtbau does not have any security interest in the 10 Boats; and that BUSA is the sole owner of the 10 Boats free and clear of any security interest or liens asserted by Defendant in order for BUSA's remaining claims to be litigated and resolved.

144.

Pursuant to Federal Rules of Civil Procedure 57, the Court may order a speedy hearing on this declaratory judgment action.

## COUNT XI
## CLAIM OBJECTION

145.

BUSA incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 144 of this Complaint.

146.

11 U.S.C. Section 502(a) provides that any proof of claim "is deemed allowed, unless a party in interest … objects." Section 502(b) and Bankruptcy Rule 3007 permit a party in interest to object to a filed proof of claim.

147.

Bavaria Yachtbau has filed two proofs of claims in this case – Proof of Claim 26, a secured claim for boat inventory that Bavaria Yachtbau asserts it is the title owner in the amount of $2,745,134.41, and Proof of Claim 27, an unsecured claim for goods, shipping costs, and other services in the amount of $1,786,783.72.

148.

In accordance with 11 U.S.C Section 502(d), the Court shall disallow the claim of a "transferee of a transfer avoidable" under 11 U.S.C. Section 547.

149.

Here, BUSA made payments to Bavaria Yachtbau in the amount of $663,933.98 during the Preference Period and those are avoidable under Section 547.

150.

11 U.S.C. Section 502(d) states further that "the court shall disallow any claim of any entity from which property is recoverable" under 11 U.S.C. Section 553.

151.

Neither of these claims meets the standard of *prima facie* validity.

152.

Bavaria Yachtbau has failed to sufficiently establish the validity of its claims and, in fact, labels Claim 26 as secured while BUSA contends that Bavaria Yachtbau does not hold a security interest in the boat inventory that is basis of its secured claim.

153.

Bavaria Yachtbau in its secured Proof of Claim 26 asserts that it is the title owner of "10 Boats." *See Proof of Claim 26, Exhibit A, 3.* If in fact Bavaria Yachtbau is the title owner of the 10 Boats then it does not have a secured claim in this case.

154.

With regard to Proof of Claim 27, 11 U.S.C. Section 502(b)(1) provides a claim shall be disallowed if the "claim is unenforceable against the debtor ... under any agreement or applicable law."

155.

Bavaria Yachtbau breached its contractual agreements with BUSA thereby negating any claim Bavaria Yachtbau may have against BUSA under those agreements attached to its Proof of Claim 27. Further, as a result of those breaches BUSA suffered actual monetary damages and losses for brand reputation damage.

156.

BUSA's objections to Bavaria Yachtbau's Proof of Claim 26 and Proof of Claim 27 initiates a contested matter requiring the Court to hold a hearing on these objections.

157.

Wherefore, Claim No. 26 and 27 should be disallowed.

## COUNT XII
## EQUITABLE SUBORDINATION

158.

BUSA incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 157 of this Complaint.

159.

The entirety of Bavaria Yachtbau's secured claim Number 26 and unsecured claim Number 27 should be equitably subordinated to all other claims filed in this case for purposes of distribution as provided by 11 U.S.C. Section 510(c)(1).

160.

Bavaria Yachtbau is an insider of BUSA based on its sufficiently close relationship with BUSA. BUSA is the exclusive dealer in the United States for Bavaria Yachtbau's boats, and BUSA's success was tethered directly to the business decisions made by Bavaria Yachtbau. Bavaria Yachtbau exercised substantial, if not complete, control over BUSA in their business

relationship and transactions between them. As an insider, Bavaria Yachtbau's conduct in its dealing with BUSA is subject to closer scrutiny than a party dealing at arm's length with BUSA.

161.

Given that Bavaria Yachtbau is an insider of BUSA, Bavaria Yachtbau's transactions with BUSA were unfair, unjust, lacked good faith, and were breaches of its contractual and fiduciary duties to BUSA.

162.

Bavaria Yachtbau has been unjustly enriched by its unconscionable, unjust, and unfair conduct with BUSA.

163.

Bavaria Yachtbau has engaged in inequitable conduct in its dealing with BUSA and BUSA's customers. Bavaria Yachtbau failed to complete product improvements that it contracted to do in the Amended Motor Yacht Dealer Contract.

164.

BUSA agreed to perform the warranty work, the customer service work, the maintenance work, and the repair work requested by the purchasers/owners of the boats with a repayment from Bavaria Yachtbau for this work in the form of a 2% lump sum discount from BUSA's purchase price of each boat. This 2% was insufficient to cover the work as the problems grew and the manufacturing defects remained unimproved prior to shipment.

165.

BUSA's customers became increasingly frustrated and angry about the defects and work required to have operable and properly functioning boats.

37

166.

Bavaria Yachtbau's collective actions immediately destroyed a minimum of two to two and half million dollars of value on the remaining boat inventory through brand reputation damage, lack of viable replacement service and dealer network, root cause product defects remaining unresolved on the inventory, and general value loss of selling the boats while in bankruptcy without any warranty.

167.

Bavaria Yachtbau's inequitable conduct has conferred an unfair advantage upon Bavaria Yachtbau. Bavaria Yachtbau's failure to perform its contractual and verbal promises to remedy manufacturing defects and to assist in repair, warranty, and maintenance work left BUSA to manage the fallout of these failures while Bavaria Yachtbau continued to reap the economic benefits of sales to BUSA while continuing to harm BUSA, BUSA's customers, and BUSA's creditors.

168.

In October 2014, Bavaria Yachtbau made false statements of material fact to BUSA that it would fix the boats' electrical systems to conform with basic operational and safety standards; and fix the boats' factory-offered air conditioning system so that it operated properly.

169.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

170.

In July 2016, Bavaria Yachtbau made false statements of material fact to BUSA that it would pay BUSA to cover its monthly operational costs and send a Bavaria Yachtbau team to go through all BUSA stock boats and fix them.

171.

BUSA justifiably relied upon those false statements, entered into agreements with Bavaria Yachtbau, and as a direct result suffered damages.

172.

Also in July 2016, Lutz Henkel of Bavaria Yachtbau convinced Mr. Feld that Bavaria Yachtbau would finally fix the design and manufacture defects, as well as work together with BUSA on a constructive resolution to the well-understood and growing payables gap.

173.

Mr. Feld flew to Giebelstadt, Germany at Mr. Henkel's urging to resolve all of the concerns previously raised by BUSA. Instead of attempting to resolve these numerous issues, Mr. Henkel induced BUSA to sign an agreement wherein BUSA immediately would pay Bavaria Yachtbau $173,000 USD and €156,000 EURO, and agree to pay 100% of all boat revenues directly to Bavaria Yachtbau. In exchange, Bavaria Yachtbau agreed to "loan-back" to BUSA cash funds to cover its monthly operational costs and finally send a Bavaria Yachtbau team to go through all BUSA stock boats and fix them.

174.

BUSA made significant good-faith cash payments to Bavaria Yachtbau immediately, but Bavaria Yachtbau refused to honor its side of the agreement, both by continuing to take no real action or investment to fix the defective boat, and also by avoiding urgent communications about

promised short-term operational cash arrangements. Moreover, Bavaria Yachtbau then refused to take any more orders for boats from BUSA, knowing that BUSA could never close the payables gap without the ability to sell defect-free inventory boats nor the ability to submit new customer order.

175.

Mr. Henkel's decisions forced BUSA out of business by not repairing the myriad product defects and not reimbursing BUSA as promised for the significant money invested in resolving constant customer support issues caused by these well-documented flaws.  His decisions allowed him to form a new United States dealership network without resolving any issues between Bavaria Yachtbau and BUSA after promising to do so.

176.

Simultaneously, but unbeknownst to BUSA at the time, Bavaria Yachtbau began actively soliciting numerous other dealers in the United States to take over BUSA's business, despite the existence of the exclusive dealership agreements.

177.

Further, Bavaria Yachtbau allowed BUSA to set up for the October 2016, Annapolis Sailboat Show where it would display 5 Bavaria Yachtbau sailboats, at a cost to BUSA of over $80,000.

178.

After the show set up, Lutz Henkel, on the first day of the Annapolis Sailboat Show, five minutes before the 5-day show started, walked down the docks to the BUSA display, and handed Mr. Feld a letter terminating all agreements between Bavaria Yachtbau and BUSA.

179.

BUSA was left holding an inventory of 10 boats, in which BUSA had well over $1,000,000 in working capital invested. The estimated fair market value of this inventory was over $5.5 million. Yet, with the brand and goodwill BUSA had invested in for years, destroyed within a month, by the actions of Bavaria Yachtbau, the value of this same inventory has been decreased by at least $2 million, and likely even more because BUSA was no longer able to service the defective boats.

180.

Bavaria Yachtbau's inequitable conduct has resulted in injury to BUSA's other creditors. Its continued action of delaying, blocking, intimidating brokers and buyers continues the delay of the sale of the boat inventory, which increases the damages to all other creditors of the estate, and further adds to the value loss of the inventory as each month passes.

181.

Since filing for bankruptcy protection, Bavaria Yachtbau continually has thwarted BUSA's efforts to sell these inventory boats as part of the bankruptcy estate. Specifically, Bavaria Yachtbau learned of potential purchases, then contacted the potential buyer and/ or the broker and threatened unspecified legal action if they participated in the deal. Because of Bavaria Yachtbau's actions, BUSA has been unable to sell any of the stock boats in the bankruptcy estate.

182.

Bavaria Yachtbau is continuing this unfair and unjust conduct in this case. It has objected to BUSA's motion to employ YachtSalesInternational.com as a broker to sell 3 of the 10 Boats.

183.

Equitably subordinating Bavaria Yachtbau's Claim Number 26 and Claim Number 27 is
not inconsistent with the provisions of the Bankruptcy Code.

## RESERVATION OF RIGHT TO AMEND

184.

BUSA reserves the right to amend this Complaint pursuant to a requested accounting as
well as other discovery should facts be discovered to justify the assertion of additional claims,
including without limitation any and all claims arising under Title 11 of the United States Code
or applicable state law.

185.

WHEREFORE, Debtor respectfully request that this Court enter a judgment against
Bavaria Yachtbau, GmbH in favor of the Plaintiff on all counts and order that:

1)      A judgment against Bavaria Yachtbau, GmbH in favor of Bavaria Yachts USA,
LLLP for the damages suffered as a result of BUSA's entire loss of its investment in excess of
$4,500,000; damages in excess of $2,500,000 it suffered having built the Bavaria brand in the U.S.
market only to have it destroyed by Yachtbau; and the damages it suffered having lost its working
capital in excess of $1,000,000 in the 10 boats as a result of Yachtbaus' tortious actions against it;

2)      An award of Bavaria Yachts USA, LLLP's attorney's fees and costs incurred in
this matter;

3)      the Preferential Transfers be avoided and BUSA recover from Defendant the value
of the transfers made, plus interest from date of filing of this action;

4)      the Fraudulent Transfers be avoided under Federal or State Law and BUSA recover
from Defendant the value of the transfers, plus interest from date of filing of this action;

5)    BUSA's claims objections be sustained;

6)    Defendant's claims be subordinated to all other claims

7)    Declare the rights of the parties as to ownership of the boats; and

8)    Any other relief the Court deems just and equitable

Respectfully submitted,

**McBRYAN, LLC**

/s/Louis G. McBryan
Louis G. McBryan, Georgia Bar No. 480993
1380 W. Paces Ferry Road
Suite 1150
Atlanta, GA 30327
Telephone (678) 733-9322
Fax (678)498-2709
lmcbryan@mcbryanlaw.com
**Attorney for Debtor**

**ROBERT ALLEN LAW**

/s/Alexander Dombrowsky
Alexander Dombrowsky, Esq., Fla. Bar No.186260
ROBERT ALLEN LAW
Four Seasons Tower
1441 Brickell Avenue, Suite 1400
Miami, Florida 33131
Tel: (305) 372-3300
Email: adombrowsky@robertallenlaw.com
*Admitted *Pro hac vice*